Kim D. Stephens
kstephens@tousley.com
Christopher I. Brain
cbrain@tousley.com
Jason T. Dennett
jdennett@tousley.com
Tousley Brain Stephens PLLC
1700 Seventh Avenue, Suite 2200
Seattle, WA 98101
Tel: (206) 682-5600
Fax: (206) 682-2992

*Plaintiffs' Settlement Class Counsel*

Keith S. Dubanevich
kdubanevich@stollberne.com
Yoona Park
ypark@stollberne.com
Stoll Stoll Berne Lokting
& Shlachter P.C.
209 SW Oak Street, Suite 500
Portland, OR 97204
Tel: (503) 227-1600
Fax: (503) 227-6840

*Plaintiffs' Settlement Class Counsel*

[Additional counsel appear on the signature page.]

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| IN RE: PREMERA BLUE CROSS CUSTOMER DATA SECURITY BREACH LITIGATION | Case No. 3:15-md-2633-SI |
| This Document Relates to All Actions. | **PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MEMORANDUM IN SUPPORT**<br><br>**ORAL ARGUMENT REQUESTED** |

# TABLE OF CONTENTS

**Page**

I.   MOTION ................................................................................................................. 1

II.   INTRODUCTION ................................................................................................... 2

III.   STATEMENT OF RELEVANT FACTS ................................................................ 3

    A.   The Terms of the Settlement ......................................................................... 3

    B.   Allegations and Procedural Posture of the Action ........................................ 5

    C.   The Settlement Process .................................................................................. 7

    D.   Administration of Notice ............................................................................... 7

    E.   Response of Class Members to the Notice ..................................................... 9

IV.   ARGUMENT .......................................................................................................... 9

    A.   The Court Should Finally Certify the Settlement Class................................. 9

        1.   The Class satisfies the Rule 23(a) and (b)(3) requirements for certification. .................................................................................. 9

        2.   The Court-approved notice program satisfies due process and has been fully implemented.............................................................. 10

    B.   The Settlement Is "Fair, Reasonable, and Adequate" and Should Be Finally Approved ....................................................................................... 11

        1.   The Settlement has no indicia of collusion and is the result of hard-fought negotiations with the aid of experienced mediators. ..................... 13

        2.   The Settlement is fair, reasonable, and adequate under the *Hanlon* factors...................................................................................... 14

            a.   The Strength of Plaintiffs' Case.................................................... 15

            b.   The Risk, Expense, Complexity, and Likely Duration of Further Litigation ...................................................................... 16

            c.   The Risk of Maintaining Class Action Status Through Trial ........ 17

            d.   The Amount Offered in Settlement................................................ 18

            e.   The Extent of Discovery Completed and the Stage of the Proceeding..................................................................................... 22

f.      The Experience and Views of Counsel ........................................23

g.      The Presence of a Governmental Participant................................23

h.      The Reaction of the Class Members to the Settlement .................24

3.      The Settlement is fair, reasonable, and adequate under the newly
amended Rule 23(d)(2) factors. ...........................................................26

a.      The Plaintiffs and Class Counsel Have Adequately
Represented the Class ....................................................................27

b.      The Proposal Was Negotiated at Arm's Length ...........................28

c.      The Relief Provided to the Class is Adequate ..............................28

d.      The Proposal Treats Class Members Equitably Relative to
Each Other .....................................................................................30

V.      CONCLUSION .............................................................................................31

# TABLE OF AUTHORITIES

## Cases

*Bell v. Consumer Cellular, Inc.*
No. 3:15-CV-941-SI, 2017 WL 2672073 (D. Or. June 21, 2017) ........................................... 23

*Churchill Vill., L.L.C. v. Gen. Elec.*
361 F.3d 566 (9th Cir. 2004) ................................................................................................. 25

*Class Plaintiffs v. City of Seattle*
955 F.2d 1268 (9th Cir. 1992) ............................................................................................... 11

*Demmings v. KKW Trucking, Inc.*
No. 3:14-CV-0494-SI, 2018 WL 4495461 (D. Or. Sept. 19, 2018) ............................ 16, 17, 23

*Garner v. State Farm Mut. Auto. Ins. Co.*
No. 08-CV-1365-CW, 2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) .................................... 14

*Hanlon v. Chrysler Corp.*
150 F.3d 1011 (9th Cir. 1998) .................................................................................... 12, 14, 27

*Hartless v. Clorox* Co.
273 F.R.D. 630 (S.D. Cal. 2011) ........................................................................................... 17

*Hefler v. Wells Fargo & Co.*
No. 16-CV-05479-JST, 2018 WL 6619983 n.5 (N.D. Cal. Dec. 18, 2018) ...................... 26, 27

*Hughes v. Microsoft Corp.*
2001 WL 34089697 (W.D. Wa. Mar. 26, 2001)...................................................................... 25

*In re Anthem, Inc. Data Breach Litig.*
327 F.R.D. 299 (N.D. Cal. 2018).......................................................................... 14, 15, 22, 25

*In re Anthem, Inc. Data Breach Litig.*
2018 WL 3960068 ........................................................................................................... 17, 19

*In re: Equifax Inc. Customer Data Security Breach Litig.* ........................................................... 19

*In re Bluetooth Headset Prods. Liab. Litig.*
654 F.3d 935 (9th Cir. 2011) ............................................................................................ 13, 14

*In re Extreme Networks, Inc. Sec. Litig.*
2019 WL 3290770 (N.D. Cal. July 22, 2019)................................................................... 27, 30

*In re Mego Fin. Corp. Sec. Litig.*
213 F.3d 454 (9th Cir. 2000) ................................................................................................. 18

*In re Netflix Privacy Litig.*
　No. 5:11-CV-00379 EJD, 2013 WL 1120801 (N.D. Cal. Mar. 18, 2013)............................... 13

*In re Omnivision Techs., Inc.*
　559 F. Supp. 2d 1036 (N.D. Cal. 2008) ............................................................. 17, 18

*In re Online DVD-Rental Antitrust Litig.*
　779 F.3d 934 (9th Cir. 2015) ...................................................................... 14

*In re Pac. Enters. Sec. Litig.*
　47 F.3d 373 (9th Cir. 1995) ....................................................................... 23

*In re Polaroid ERISA Litig.*
　240 F.R.D. 65 (S.D.N.Y. 2006) .................................................................... 27

*In re Premera Blue Cross Customer Data Sec. Breach Litig.*
　No. 3:15-MD-2633-SI, 2019 WL 3410382 (D. Or. July 29, 2019)................................... *passim*

*In re Syncor ERISA Litig.*
　516 F.3d 1095 (9th Cir. 2008) ..................................................................... 11

*In re Target Corp. Customer Data Sec. Breach Litig.*
　892 F.3d 968 (8th Cir. 2018) ...................................................................... 19

*In re Target Corp. Customer Data Sec. Breach Litig.*, No. MDL 14-2522 (PAM)
　2017 WL 2178306 (D. Minn. May 17, 2017)........................................................ 25

*Lane v. Brown*
　166 F. Supp. 3d 1180 (D. Or. 2016) ...................................................... 22, 23, 24

*Linney v. Cellular Alaska P'ship*
　151 F.3d 1234 (9th Cir. 1998) ..................................................................... 22

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*
　221 F.R.D. 523 (C.D. Cal. 2004) ......................................................... 16, 22, 23, 25

*Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*
　688 F.2d 615 (9th Cir. 1982) ...................................................................... 11

*Rodriguez v. W. Publ'g Corp.*
　563 F.3d 948 (9th Cir. 2009) ...................................................................... 18

*Wal-Mart Stores, Inc. v. Dukes*
　564 U.S. 338 (2011)................................................................................ 12

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*
　396 F.3d 96 (2d Cir. 2005)......................................................................... 14

*Zamora Jordan v. Nationstar Mortg., LLC*
   2019 WL 1966112 (E.D. Wash. May 2, 2019) ........................................................................ 30

**Statutes**

28 U.S.C. § 1715 ........................................................................................................................ 23

Cal. Civ. Code §§ 56.36, 56.101(a) ............................................................................................ 5

RCW § 19.86.020 ........................................................................................................................ 5

**Rules**

Fed. R. Civ. P. 23 ............................................................................................................... *passim*

**Other Authorities**

*Manual for Complex Litigation, Third*, § 30.42 (1995) ............................................................ 14

## **LR 7-1 CERTIFICATION**

In compliance with Local Rule 7-1(a), the Parties, through their respective counsel, have conferred.  Defendant Premera Blue Cross ("Defendant" or "Premera") does not oppose this Motion.

## I.      **MOTION**

Pursuant to the proposed Settlement Agreement[1] ("SA") and the Court's Order Preliminarily Approving Class Action Settlement and Notice Procedures and Setting Final Approval Hearing (Dkt. 279), Plaintiffs move the Court for an order: 1) finally certifying the Settlement Class for the purposes of the Settlement in this Action ("Settlement"); and 2) granting final approval of the Settlement.

This Motion is supported by the Declaration of Cameron R. Azari, Esq. on Implementation and Adequacy of Settlement Notice Plan and Notices (Dkt. 280) ("First Azari Decl."), the Supplemental Declaration of Cameron R. Azari, Esq. on Implementation and Adequacy of Settlement Notice Plan ("Second Azari Decl."), the Declaration of Kim D. Stephens in Support of Plaintiffs' Motion for Final Approval and Motion for Award of Attorneys' Fees and Reimbursement of Expenses ("Stephens Decl."), the Declaration of Keith Dubanevich in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement ("Dubanevich Decl."), and the record of this case.

---

[1] The Settlement Agreement appears at Dkt. 273-1.  Capitalized terms not otherwise defined have the meanings identified in the Settlement Agreement.

## II.    INTRODUCTION

After almost five years of hard-fought and contentious litigation, Plaintiffs reached a

substantial settlement with Premera, conservatively valued at over $43.8 million, to resolve

claims in this data breach MDL class litigation.

The Settlement includes $32 million in cash, of which no less than $10 million will be

used to provide cash payments directly to Class Members.  In addition, the Settlement provides

Class Members with the option to enroll in two years of free credit monitoring and identity theft

insurance—designed to protect Class Members from a risk of future harm stemming from the

data breach publicly disclosed on March 17, 2015 ("Data Breach")—with the ability to delay the

start date of this benefit for those Class Members who already have these services.  Finally, the

Settlement requires Premera to spend $42 million on improved data security by 2022 and

imposes other injunctive relief in the form of future business practice changes to ensure Premera

is adequately protecting Class Members' sensitive information.  The benefit to the Class is

approximately $43.8 to $74 million for those two components of the Settlement, not including

the value to the Class of credit monitoring and identity theft insurance.  In all respects, this data

breach settlement is outstanding and merits final approval.

The Court granted preliminary approval of the Settlement on July 29, 2019.  *In re*

*Premera Blue Cross Customer Data Sec. Breach Litig.*, No. 3:15-MD-2633-SI, 2019 WL

3410382, at *25 (D. Or. July 29, 2019) (Dkt. 279) ("Preliminary Approval Order").  Pursuant to

the Court's Order, the Settlement Administrator disseminated Class Notice under a robust, multi-

pronged Notice Plan, including direct mail notice by U.S. mail, email notice, Publication Notice,

and the creation of a settlement website.  Plaintiffs now move the Court for an order: 1) finally

certifying the Settlement Class for the purposes of the Settlement; and 2) granting final approval

of the Settlement.  The Class satisfies the requirements for certification under Rule 23(a) and

(b)(3), and the fully implemented, Court-approved notice program satisfies Rule 23 and due

process requirements.  Whether the Court analyzes the Settlement under the framework of the

*Hanlon* factors traditionally employed by the Ninth Circuit, or under the newly promulgated

factors set forth in recently-amended Rule 23(e)(2), the Settlement is fair, reasonable, and

adequate, and meets the standards for final approval.

## III.    STATEMENT OF RELEVANT FACTS

### A.    The Terms of the Settlement

The full terms of the Settlement are contained in the proposed Settlement Agreement.[2]

(Dkt. 273-1).  As part of the Settlement, Premera agreed to fund a Qualified Settlement Fund

totaling $32 million, which will be used to satisfy attorneys' fees, costs, Class Notice, Settlement

Administration costs, service awards, and credit monitoring, identity theft insurance, and cash

payments to Class members.  (SA, §§ III, IV, V, VI, IX).  This is a non-reversionary fund—no

portion of the Qualified Settlement Fund reverts to Premera unless the Settlement is voided,

cancelled, or terminated.  (SA, ¶ 3.7).  Each Class Member is eligible to receive both credit

monitoring/identity theft insurance *and* a cash payment, which is virtually unprecedented in any

data breach settlement thus far.  For the cash payment, Class Members may choose from three

forms of relief:

---

[2] Separately from the Settlement Agreement, the Parties previously submitted to the Court, under seal, the specific terms of a tip over agreement.  (Dkt. 278).

1.      Reimbursement of Out-of-Pocket Losses: Class Members who submit Reasonable Documentation of verified unreimbursed costs or expenditures plausibly traceable to the Data Breach (such as unreimbursed losses or charges due to identity theft, freezing or unfreezing of credit, credit monitoring costs, lost time, etc.), can recover those losses, up to $10,000.  (SA, ¶ 4.3).

2.      Default Payments: Class Members who do not submit a claim for Out-of-Pocket Losses may file a claim for alternative compensation of up to $50, no documentation required.  (SA, ¶ 4.4).

3.      California Payments: Class Members who, as of March 17, 2015, resided in California may receive up to $50 as additional compensation for claims under California's Confidentiality of Medical Information Act ("CMIA").  (SA, ¶ 4.5).

No less than $10 million of the Qualified Settlement Fund will provide direct cash payments to those Settlement Class Members who submit valid Claim Forms.  (SA, ¶ 4.2).

The Settlement Agreement also provides for valuable, equitable, injunctive relief: Premera has committed to certain business practices for three years from the date of final approval, including spending $42 million on improved data security practices between 2019 and 2022.  (SA, Ex. A).  With this increased spend on security, Premera has agreed to implement defined, enhanced security measures specifically designed to protect Class Members' sensitive information:

- Archive data that has not been accessed in five years to a separate environment that is not connected to the internet;
- Encrypt social security numbers and other sensitive data;
- Implement increased network monitoring and logging of monitored activity;
- Undergo annual third-party security audits and testing exercises;
- Implement stronger passwords, reduce employee access to sensitive data, and

enhance email protection;
- Operate a Cyber Security Operations Center 24x7x365;
- Require two-factor authentication for remote access for all personnel and vendors; and
- Require Information Security training for its associates.

(SA, Ex. A).  Because Premera still retains databases containing all of the same sensitive Class Member data that it did at the time of the breach, ensuring Premera adequately protects this data going forward was a critical part of the relief Class Counsel negotiated for the Class.  Stephens Decl. ¶ 41.  These business practice commitments are designed to prevent another breach from happening and thereby directly and materially benefit the Class.  Stephens Decl. ¶ 41.  An expert economist, Dr. Robert Vigil, has isolated the benefit to Settlement Class Members from the injunctive relief and calculated this benefit to the Class as having a measurable value of at least $11,872,000.00.  Declaration of Robert L. Vigil, Ph.D. in Support of Motion for Preliminary Approval (Dkt. 274) ("Vigil Decl."), ¶¶ 10–17, 18–20.

**B.**      **Allegations and Procedural Posture of the Action**

On March 17, 2015, Premera publicly disclosed a breach of its computer system.  The Data Breach affected over 8.85 million[3] Class Members.  Plaintiffs filed their respective complaints between March 18, 2015 and July 21, 2017, averring that Premera was negligent, breached its contracts, and violated the Washington Consumer Protection Act ("CPA") (RCW § 19.86.020) and the CMIA (Cal. Civ. Code §§ 56.36, 56.101(a)) when it failed to prevent Plaintiffs' confidential information—including personally identifying information ("PII"), protected health information ("PHI"), and "medical information" as that term is defined under

---

[3] The Class size was reduced through de-duplication, from an estimated 10.6 million to 8,855,764.  (*See* First Azari Decl. ¶ 10).

Page 5 -   **PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MEMORANDUM IN SUPPORT**

the CMIA (collectively "Personal Information")—from being compromised in the Data Breach. (Dkt. 75).  The Judicial Panel on Multidistrict Litigation consolidated the various cases in this Court in September 2015.  (Dkt. 1, 3, 6).

Plaintiffs filed their initial Consolidated Class Action Allegation Complaint on October 6, 2015, and their First Amended Consolidated Class Action Allegation Complaint on September 30, 2016.  (Dkt. 44, 75).  During the course of the litigation, the Parties engaged in significant discovery.  Plaintiffs reviewed over 1.5 million pages of documents, and the Parties collectively took more than 50 depositions.[4]  *See* Stephens Decl. ¶¶ 18–27.

Plaintiffs have overcome multiple challenges to the legal sufficiency of their complaints and have engaged in extensive motions practice during the pendency of this Action.  (Dkt. 49, 53, 54, 78, 81, 84, 91).  For example, the Parties sought the Court's guidance on several discovery disputes, including motions regarding Defendant's work product and privilege assertions, which resulted in the appointment of a Special Master, several hearings, and two published decisions.  (Dkt. 103, 110, 113, 117, 119, 120, 132).  In addition, before reaching this Settlement, the Parties fully briefed Plaintiffs' Motion for Class Certification, as well as several motions to exclude certain expert testimony.  (Dkt. 156–68, 190, 195–97, 211–19, 222–27, 247, 260–64).  The Court heard oral argument on these motions on November 15, 2018.  (Dkt. 229).

---

[4] *See Plaintiffs' Motion and Supporting Memorandum for an Award of Attorneys' Fees and Expenses and for Class Representative Service Awards* ("Plaintiffs' Motion for Attorneys' Fees"), Section II.C, submitted concurrently with this Motion, for further discussion regarding Plaintiffs' discovery efforts in this case.

## C.    The Settlement Process

Class Counsel obtained the Settlement through arduous negotiations assisted by experienced mediators.  While the Court's decisions on the Motion for Class Certification and other motions were pending, the Parties engaged in extensive, arm's-length settlement negotiations.  Specifically, the Parties engaged in three in-person mediation sessions with the assistance of the Honorable Jay C. Gandhi (Ret.) of JAMS, Peter K. Rosen, Esq. of JAMS for two of the sessions, and had multiple follow up emails and telephone conferences with both Judge Gandhi and Mr. Rosen.  Stephens Decl. ¶¶ 32–33.  In the evening of February 14, 2019, the Parties reached preliminary agreement on the terms of a nationwide settlement and continued to negotiate the terms of the final Settlement Agreement over the course of the next few months.  Stephens Decl. ¶ 34.  The Parties executed the Settlement Agreement on May 29, 2019.  (SA, at 44).

## D.    Administration of Notice

The preliminarily certified Class consists of all persons whose Personal Information was stored on Premera's computer network systems that were compromised in the Security Incident as publicly disclosed on March 17, 2015, with specified exclusions.[5]  Preliminary Approval Order, 2019 WL 3410382, at *25.  The Court set forth its requirements for dissemination of notice to Class Members in Paragraphs 8, 9, and 11 of its July 29, 2019 Order.  Preliminary

---

[5] Excluded from the Settlement Class are: (1) the Judge presiding over the Action, and members of his family; (2) Premera, its subsidiaries, parent companies, successors, predecessors, and any entity in which Premera or its parents have a controlling interest and their current or former officers and directors; (3) Persons who properly execute and submit a request for exclusion prior to the expiration of the Opt-Out Period; and (4) the successors or assigns of any such persons.  *In re Premera Blue Cross Customer Data Sec. Breach Litig.*, No. 3:15-MD-2633-SI, 2019 WL 3410382, at *25 (D. Or. July 29, 2019) (Dkt. 279) ("Preliminary Approval Order").

Approval Order, 2019 WL 3410382, at *26.  Following the Court's Order, the Settlement

Administrator, Epiq Systems, Inc. ("Epiq"), implemented the notice program as follows:

**Preliminary Approval Order ¶ 8**.  On August 29, 2019, Epiq established the settlement

website (https://www.premerasettlement.com), where Class Members can view and print the

Class Notice, the Settlement Agreement, the Preliminary Approval Order, and the Claim Form.

Epiq has maintained and updated the settlement website throughout the Claims Period.  *See* First

Azari Decl. ¶ 22.

**Preliminary Approval Order ¶ 9**.  Epiq printed and sent copies of the Class Notice

through U.S. Mail to 8,671,074 potential Class Members between September 13, 2019 and

October 15, 2019.  First Azari Decl. ¶ 12; Second Azari Decl. ¶ 5.  If mailed notices were

returned as undeliverable, Epiq attempted to locate updated address information by processing

the names and addresses through a third-party address lookup service.  First Azari Decl. ¶ 14;

Second Azari Decl. ¶ 6.  Epiq located updated addresses and as of January 8, 2020, re-mailed

1,278,782 records that had originally been returned as undeliverable.  Second Azari Decl. ¶ 6.

Epiq also sent 1,416,369 supplemental notices via email to all potential Class Members for

whom Premera was able to identify an individual email address record.  First Azari Decl. ¶ 16;

Second Azari Decl. ¶ 5.

On August 29, 2019, Epiq published the Publication Notice in the Wall Street Journal, as

well as in sponsored search listings for Google, Yahoo!, and Bing (geo-targeted for Alaska,

Washington, Oregon, and California).  First Azari Decl. ¶¶ 18–19.  Local sponsored search

listings will run through the exclusion/objection deadline of January 29, 2020.  First Azari Decl.

¶ 19.  In addition, Epiq issued a nationwide press release on August 29, 2019.  First Azari Decl. ¶

21.  Contacted by local television media, Mr. Stephens also granted an interview to summarize Settlement benefits and claims procedures.  Stephens Decl. ¶ 65.

**Preliminary Approval Order ¶ 11.**  On December 30, 2019, Class Counsel filed the Declaration of Cameron Azari (Dkt. 280), the Court-appointed Notice Specialist in this Action, attesting to satisfaction of the mailing and publishing requirements.

### E.    Response of Class Members to the Notice

Through the time of the filing of this Motion, 691,870 Class Members have returned claim forms (Second Azari Decl. ¶12), amounting to a 7.81% claims rate—an extraordinary response in a data breach case.  *See* First Azari Decl. ¶ 10.  By contrast, Class Counsel or the Claims Administrator have received only one objection and 560 requests for exclusion from the Class.  Stephens Decl. ¶ 49; Second Azari Decl. ¶ 11.

## IV.    ARGUMENT

### A.    The Court Should Finally Certify the Settlement Class

Plaintiffs respectfully request that the Court grant final certification of the Settlement Class because: 1) the Class satisfies the requirements of Rule 23(a) and (b)(3); and 2) the Court-approved notice program satisfies both Rule 23 and due process requirements and has been fully implemented pursuant to the Court's requirements.

#### 1.    The Class satisfies the Rule 23(a) and (b)(3) requirements for certification.

The Court completed the first step in the settlement approval process when it granted preliminary approval of the Settlement and provisionally certified the Settlement Class.  (Dkt. 279).  The Preliminary Approval Order made specific preliminary findings that the Class meets each of the four Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy.

Preliminary Approval Order, 2019 WL 3410382, at *25. Likewise, the Court found that the

Class met each of the Rule 23(b)(3) requirements: that questions of law and fact common to the

members of the Class predominate over any "questions affecting any individual Class Member,"

and that a class action is superior to other available methods of fairly and efficiently adjudicating

this controversy. *Id.* Plaintiffs respectfully submit that nothing has changed since the Court

made these findings, and they remain correct.

>    **2.    The Court-approved notice program satisfies due process and has been fully implemented.**

The notice provided to a class certified under Rule 23(b)(3) must satisfy Rule 23(c)(2),

which requires "the best notice that is practicable under the circumstances." Fed. R. Civ. P.

23(c)(2)(B). The Court preliminarily approved the forms of Plaintiffs' Publication Notice, Long

Form Notice, and Summary Notice, finding that they complied with the requirements of Rule 23

and due process. Preliminary Approval Order, 2019 WL 3410382, at *26. The Court also

approved Plaintiffs' proposed manner of distribution of the Publication Notice, Long Form

Notice, and Summary Notice as compliant with the requirements of Rule 23 and due process,

ordering the Claims Administrator to: a) establish a settlement website and post the basic

documents related to the Settlement prior to the dissemination of Class Notice; b) cause the

Publication Notice to be published in a manner agreed upon by the parties by August 29, 2019;

and c) cause a copy of the Summary Notice to be mailed by first class mail and by email to Class

members for whom Premera has an existing email address between September 13, 2019 and

November 13, 2019. *Id.* The Court further ordered Class Counsel to file Proof of Notice with

this Court no later than December 30, 2019. *Id.* The December 30, 2019 Declaration of

Cameron Azari (Dkt. 280) and the contemporaneously submitted Second Azari Declaration

fulfill Class Counsel's obligation by showing the Claims Administrator's compliance with the above-noted requirements.

The Court found that the form of the Publication Notice, Long Form Notice, Summary Notice, and the Administration of Notice Plan each complied with Rule 23 and due process requirements, and the Claims Administrator complied with the Order regarding Administration of Notice. *See supra* Section III.D.  Thus, notice to the Class complied with Rule 23 and due process requirements, fairly apprises Class Members of their rights with respect to the Settlement, and is the best notice practicable under the circumstances.  Accordingly, the Court should grant final certification of the Settlement Class.

### B.    The Settlement Is "Fair, Reasonable, and Adequate" and Should Be Finally Approved

The Ninth Circuit recognizes a "strong judicial policy that favors settlements."  *In re Syncor ERISA Litig*., 516 F.3d 1095, 1101 (9th Cir. 2008).  A settlement hearing is "not to be turned into a trial or rehearsal for trial on the merits."  *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).  The court need not "reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements."  *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1291 (9th Cir. 1992), quoting *Officers for Justice,* 688 F.2d at 625.  Nor should a proposed settlement be "judged against a hypothetical or speculative measure of what might have been achieved by the negotiators."  *Officers for Justice*, 688 F.2d at 625.  The appropriate standard "is not whether the final product could be prettier, smarter or snazzier, but whether it is

fair, adequate and free from collusion." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338 (2011).

Where a settlement is binding on class members, the Court may approve it only "after a hearing and only on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Prior to the December 2018 amendment of Rule 23(e), the rule provided no guidance on how to make this assessment; the Ninth Circuit therefore developed a two-step process whereby a court, if the settlement was obtained prior to certification of the class, would scrutinize the settlement itself and the process leading to the settlement for evidence of procedural unfairness or collusion. If the court found no indicia of collusion, it would next analyze the substantive fairness of the settlement under the *Hanlon* factors.

As described below, there are no indicia of collusion in the Settlement.  To the contrary, the hard-fought nature of the litigation and settlement negotiations, along with the assistance of experienced mediators in the settlement negotiations, demonstrates the lack of collusion. Further, analysis of the *Hanlon* factors confirms that the Settlement is substantively fair to the Class.  Accordingly, the Court should find the Settlement to be fair, reasonable, and adequate and merits final approval.

In December 2018, Rule 23(e)(2) was amended to provide a list of factors, similar to the *Hanlon* factors, for a court to consider when analyzing the fairness of a settlement.  Although it is unclear whether the new Rule 23(e)(2) factors apply retroactively to this Settlement, analysis of these factors also demonstrates that the Settlement is fair, reasonable, adequate and deserving of final approval.

1.      **The Settlement has no indicia of collusion and is the result of hard-fought negotiations with the aid of experienced mediators.**

The Ninth Circuit recognizes that approval of a settlement prior to formal class certification presents risks of conflict of interests between Class Counsel and the Class. The Court is thus required to engage in "an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *In re Bluetooth Headset Prods. Liab. Litig*., 654 F.3d 935, 946 (9th Cir. 2011). The Ninth Circuit recognizes that "[c]ollusion may not always be evident on the face of a settlement, and courts therefore must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id.* at 947.

The Settlement here has none of the indicia of possible collusion identified by the Ninth Circuit, such as a disproportionate attorneys' fee, a "clear sailing" fee agreement separate and apart from Class funds, or the reversion of unpaid fees to the defendant. *See id*. at 947.

Indeed, the fact that the Settlement was the product of extensive arm's-length negotiations between highly experienced and capable counsel in formal mediation processes overseen by Honorable Jay C. Gandhi (Ret.) of JAMS, with the additional aid of Peter K. Rosen, Esq. of JAMS, is convincing evidence that the Settlement was not the result of collusion. The fact that the Parties reached the Settlement with the assistance of neutral mediators is a "factor weighing in favor of a finding of non-collusiveness." *In re Bluetooth*, 654 F.3d at 948. Courts within the Ninth Circuit "have afforded a presumption of fairness and reasonableness of a settlement agreement where that agreement was the product of non-collusive, arms' length negotiations conducted by capable and experienced counsel." *In re Netflix Privacy Litig*., No.

Page 13 - **PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND MEMORANDUM IN SUPPORT**

5:11-CV-00379 EJD, 2013 WL 1120801, at *4 (N.D. Cal. Mar. 18, 2013); *Garner v. State Farm Mut. Auto. Ins. Co.*, No. 08-CV-1365-CW, 2010 WL 1687832, at *13 (N.D. Cal. Apr. 22, 2010); *see also In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 327 (N.D. Cal. 2018) ("[T]he assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive." (internal quotation omitted)); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) ("A 'presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.'" (quoting *Manual for Complex Litigation, Third*, § 30.42 (1995))).

None of the indicia of collusion identified in *In re Bluetooth* are present in this Action. To the contrary, the Parties entered into the Settlement after hard-fought negotiations with the assistance of independent mediators, confirming the procedural fairness and lack of collusion between the Parties. *See supra* Section III.C. Accordingly, the Court should consider whether the Settlement is fair, reasonable, and adequate under the *Hanlon* factors.

## 2. The Settlement is fair, reasonable, and adequate under the *Hanlon* factors.

To evaluate the fairness of a settlement, the Ninth Circuit considers the following factors from *Hanlon v. Chrysler Corp.*, 150 F.3d at 1027: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status through the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944 (9th Cir. 2015).

### a. The Strength of Plaintiffs' Case

In considering whether to enter into the Settlement, the Plaintiffs, represented by experienced counsel, weighed the risks in establishing the elements of their claims. Plaintiffs and Plaintiffs' Counsel were confident in the strength of their case, but also pragmatic in their evaluation of the risks of protracted litigation and the various defenses advanced by Premera. In general, because "[d]ata-breach litigation is in its infancy with threshold issues still playing out in the courts," these risks may be higher in such cases and support approval of settlement. *See In re Anthem*, 327 F.R.D. at 317 (noting that "legal uncertainty supports approval of a settlement"). Here, Plaintiffs engaged in extensive discovery and, as detailed in their briefing submitted in support of class certification, believe they have built a strong case for liability. However, Premera continues to deny liability. Through the settlement process, Premera continued to dispute key factual issues, including whether hackers exfiltrated Personal Information, and challenged Plaintiffs' damages theories by arguing that no data ever appeared on the dark web. *See* Stephens Decl. ¶ 13. Plaintiffs believed they had answers to those arguments and believed their damages theories were viable. However, given the obstacles and inherent risks Plaintiffs faced with respect to the novel claims in data breach class actions, Plaintiffs did not underestimate their risk of non-recovery from adverse findings on these issues. Furthermore, given Premera's significant defenses at summary judgment, including the argument that Plaintiffs' damages are barred by the filed-rate doctrine, proposed Settlement Class Members might have recovered only a fraction of the proposed Settlement Agreement benefits, or even lost the case at or before trial, recovering nothing at all.

Late in the settlement negotiations, the Parties asked the Court to stay any ruling on class certification, to allow the parties to reach a settlement.  Stephens Decl. ¶ 34.  If negotiations were unsuccessful, the Parties anticipated a ruling from the Court on class certification, which posed significant obstacles.  In addition, Premera filed a Motion for Partial Summary Judgment on issues related to the filed-rate doctrine (Dkt. 175), which is still pending as of the date of this Settlement, posing additional jeopardy to some of Plaintiffs' claims.  The risks of an adverse ruling on class certification, on summary judgment, at trial, or post-trial, are always substantial.  The additional inherent risks posed by data breach litigation, a newly developing area of the law, further support a finding that the Settlement is fair, reasonable, and adequate.

### b.    The Risk, Expense, Complexity, and Likely Duration of Further Litigation

The expense of litigation is the central issue under this *Hanlon* factor.  *Demmings v. KKW Trucking, Inc.*, No. 3:14-CV-0494-SI, 2018 WL 4495461, at *8 (D. Or. Sept. 19, 2018).  Generally, "unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results."  *Id.* (quoting *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004)).

As the Court already found, this case is complex, "has been expensive to litigate, and continuing litigation would be time-consuming and add further expense."  Preliminary Approval Order, 2019 WL 3410382, at *21.  Furthermore, motions for class certification and *Daubert* motions are pending, Premera's motion for partial summary judgment is pending and would require additional briefing, and further dispositive motions would likely follow.  *Id.*  Plaintiffs have already spent over $1.2 million in costs on the litigation to date, and those expenses would only continue to rise.  Stephens Decl. ¶ 82.  Continuing litigation through class certification,

summary judgment, trial, and appeals would have been extremely expensive, and had the potential to delay recovery for Class Members for years.  And during this period, significant expenses for travel, expert witness fees, deposition reporting and transcripts, electronic document review, and other litigation expenses would continue to escalate.

Without settlement, resolution of this case would take many years and require significant litigation expenses, with the end result far from certain.  *See Hartless v. Clorox* Co., 273 F.R.D. 630, 640 (S.D. Cal. 2011), *aff'd in part*, 473 F. App'x 716 (9th Cir. 2012) ("Considering these risks, expenses and delays, an immediate and certain recovery for class members, including full relief for property damage or the reimbursement of the cost of the product favors settlement of this action.").  The present value of a significant settlement, as opposed to the highly speculative possibility of a better settlement to be obtained after a trial and appeal many years in the future, supports approval of the Settlement.  *See In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008).

### c.    The Risk of Maintaining Class Action Status Through Trial

At the time that the Settlement was reached, Plaintiffs' Motion for Class Certification was fully briefed and argued, but the Court had not yet issued a decision.  While Plaintiffs believe that this case is well-suited for class action treatment, there is still a risk that the Court would not grant class certification to some or all of Plaintiffs' claims.  *See In re Anthem, Inc. Data Breach Litig.*, 2018 WL 3960068, at *12 (noting scarcity of precedent favoring class certification in data breach litigation); *Demmings*, 2018 WL 4495461, at *8 (noting that the risk that claims would not be certified weighed in favor of approval).  In addition to the risks inherent in litigating an unsettled area of the law, Plaintiffs sought to certify a nationwide class under

Washington's CPA based on a well-supported yet untested legal position. (*See* Dkt. 156, at 61–66 and Dkt. 218, at 23–29 (discussing precedent favoring nationwide class for Washington CPA claim)).  Plaintiffs had to contend with the significant risk that class certification could have been denied in whole or in part.

Even assuming Plaintiffs obtained certification of the Class throughout the entire Class Period, the Ninth Circuit recognizes the inherent risk that a district court "may decertify a class at any time."  *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009); *see also In re Omnivision Techs.*, 559 F. Supp. 2d at 1041 ("Even if the Court were to certify the class, there is no guarantee the certification would survive through trial, as Defendants might have sought decertification or modification of the class.").  Accordingly, the risk and uncertainty surrounding certification of the Class also support approval of the Settlement.

### d.    The Amount Offered in Settlement

The Court judges the amount of settlement in context—specifically, in comparison to the relief that the Class could recover at trial—adjusted for the risk, expense, and delay of actually going to trial.  Thus, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not *per se* render the settlement inadequate or unfair."  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000).

Here, the Settlement provides valuable monetary and non-monetary relief.  In terms of monetary relief, the Settlement creates a Qualified Settlement Fund totaling $32 million, of which a *minimum* of $10 million will be used to provide direct cash compensation to those proposed Settlement Class Members who submit valid Claim Forms.  (SA, ¶¶ 3.1, 4.2).  The Settlement affords compensation to the Class including: up to $10,000 per Class Member who

can prove out-of-pocket damages plausibly traced to the Data Breach, a default settlement

amount of up to $50 for other Class Members, and up to an additional $50 for Class Members

who were California residents at the time of the Data Breach.  As the Court noted, the guaranteed

cash compensation available from the Qualified Settlement Fund "is of value to Class Members."

Preliminary Approval Order, 2019 WL 3410382, at *23.

Indeed, the cash component of the Settlement is far superior to similar settlements in

other data breach cases on a per capita basis.  *Cf., e.g.*, *In re Anthem, Inc. Data Breach Litig.*,

2018 WL 3960068, at *10 (cash settlement fund of $115 million for class of 79.15 million

individuals); *In re: Equifax Inc. Customer Data Security Breach Litig.*, No. 1:17-md-02800-

TWT (N.D. Ga.), Dkt. 858 at 11 (cash settlement fund of $380.5 million for class of 147 million

members); *In re: The Home Depot Inc. Customer Data Security Breach Litig.*, No. 1:14-md-

02583, Dkt. 261 at *2–4 (cash fund of $27.2 million for 52 million consumers); *In re Target

Corp. Customer Data Sec. Breach Litig.,* No. 1:14-md-02522-PAM (D. Minn. Nov. 17, 2015),

Dkt. 645 (approving settlement including cash fund of $10 million for an estimated 97 million

consumers) (finally affirmed by *In re Target Corp. Customer Data Sec. Breach Litig*., 892 F.3d

968 (8th Cir. 2018)).  The cash component of the Settlement that Class Counsel obtained for the

Class here (cash settlement fund of $32 million for a class of approximately 8.85 million)

exceeds each of these approved data breach settlements when scaled on a per capita basis.

In addition to cash payments, the Settlement provides for two years of credit monitoring

and identity theft insurance for Settlement Class Members who submit an email address on their

claim form.  (SA, ¶¶ 4.3.1, 4.4.1, 4.5.1, 4.6.1).  As the Court noted, this monitoring and

insurance "has a significant value to the Settlement Class."  Preliminary Approval Order, 2019

WL 3410382, at *23.  Because the retail value of two years of credit monitoring and identity

theft insurance is $479.76 per individual, there is an added value of $42,486,413 for every one

percent of the Class that enrolls in the benefit, before subtracting the cost of the credit

monitoring.[6]  *See* Declaration of Jerry Thompson in Support of Preliminary Approval (Dkt. 275)

("Thompson Decl."), ¶ 7.  Given that the Settlement Class includes over 8.85 million individuals,

this is an enormous benefit, potentially saving Settlement Class Members over a hundred million

dollars, were they to obtain similar credit-monitoring products on their own.  The Claims

Administrator is in the process of reviewing submitted claims; of the 551,597 claims processed

(79.73% of claims received), 315,853 Class Members have submitted a claim for credit

monitoring and identity theft insurance (57.26% of claims processed).  Second Azari Decl. ¶ 12.

At the present claims rate, this is already equivalent to $148,803,635.28 in *additional* value to

the participating Class Members, after subtracting the cost of providing the services.  *See* Second

Azari Decl. ¶ 12; Thompson Decl. ¶ 7.

Further, the value of the credit monitoring and identity theft insurance is increased due to

Settlement Class Members' ability to delay the start of these services for up to two years after the

Settlement, allowing those who already have monitoring services to obtain this benefit after their

current monitoring has expired.  Stephens Decl. ¶ 42; Preliminary Approval Order, 2019 WL

3410382, at *23 (allowing Class Members to tack this benefit onto existing credit monitoring

"provides added benefit" to the Settlement).

---

[6] The wholesale cost of the credit monitoring and identity theft insurance provided by
Identity Guard, to be paid from the Qualified Settlement Fund, is $2,730,000.  Stephens Decl. ¶
39.

The Qualified Settlement Fund is a non-reversionary fund, meaning that no portion of the Qualified Settlement Fund will revert to Premera unless the Settlement is voided, cancelled, or terminated.  (SA, ¶ 3.7).  The Qualified Settlement Fund will satisfy attorneys' fees and costs, Class Notice, Settlement Administration costs, service awards for the Representative Plaintiffs, and credit monitoring, identity theft insurance and cash payments to Class Members.  (SA, §§ III, IV, V, VI, IX).

In the fee petition filed concurrently with this Motion, Class Counsel seek approval of $12,752,610.97 in attorneys' fees and $1,247,389.03 in expenses, as permitted by the Settlement Agreement.  For the reasons enumerated in the concurrently submitted fee petition, Class Counsel believe this is a reasonable award of fees and costs in this case, particularly given the duration of this case, the exceptional efforts of Class Counsel, and the outstanding results for the Class.  *See* Plaintiffs' Motion for Attorneys' Fees.

The Settlement Agreement also provides for equitable injunctive relief.  Premera has committed to certain business practices for three years from the date of final approval and will spend $42 million on improved data security between 2019 and 2022 to implement defined and enhanced security measures designed to protect Class Members' sensitive information.  (SA, Ex. A).  Assuming the Court declines to value the relief at the direct cost to Premera, Plaintiffs' expert Dr. Robert Vigil estimates that the conservative value of this injunctive relief to the Settlement Class is at least $11,872,000.[7]  Vigil Decl. ¶¶ 10–17, 18–20.  Other courts addressing data breach litigation have concluded that similar nonmonetary relief "benefits millions of

---

[7] *See* Plaintiffs' Motion for Attorneys' Fees, Section III.A.2 for extensive discussion on the value of Premera's business practice commitments to the Settlement Class.

Settlement Class Members, including those who did not submit a claim form" and "further weighs in favor of final approval." *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. at 319. The total value of the Settlement, which includes the cash settlement, value of the credit monitoring and identity theft insurance, and value of the increased data security that Premera will implement, is adequate, fair, and reasonable. For these reasons, this factor weighs in favor of final approval.

### e.    The Extent of Discovery Completed and the Stage of the Proceeding

This factor requires that the Court evaluate whether "the parties have sufficient information to make an informed decision about settlement." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998). Specifically, a "settlement following sufficient discovery and genuine arms-length negotiation is presumed fair." *DIRECTV, Inc.*, 221 F.R.D. at 528. Where most of the discovery is completed, "it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case." *Lane v. Brown*, 166 F. Supp. 3d 1180, 1190 (D. Or. 2016), quoting *DIRECTV, Inc.,* 221 F.R.D. at 527.

Class Counsel aggressively litigated this case for almost five years, during which time Premera challenged Plaintiffs' legal theories in multiple motions to dismiss, and the Parties have engaged in extensive fact discovery. The substantial briefing and discovery in this matter indicate that "the proposed settlement was reached only after the parties had exhaustively examined the factual and legal bases of the disputed claims." *DIRECTV, Inc.*, 221 F.R.D. at 528. The extent of the discovery and motions practice in this case "strongly militates in favor of the Court's approval of the settlement." *See id.*

### f.       The Experience and Views of Counsel

Class Counsel are experienced class action litigators and recommend the Settlement as fair, reasonable and adequate and in the best interests of the Class Members.  Dubanevich Decl. ¶ 3; Stephens Decl. ¶¶ 40–50.  "Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995).  Accordingly, "'[g]reat weight' is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation."  *Bell v. Consumer Cellular, Inc.*, No. 3:15-CV-941-SI, 2017 WL 2672073, at *6 (D. Or. June 21, 2017) (quoting *DIRECTV, Inc*., 221 F.R.D. at 528). "Absent fraud or collusion, courts can, and should, rely upon the judgment of experienced counsel for the parties, when assessing a settlement's fairness and reasonableness."  *Demmings*, 2018 WL 4495461, at *9 (internal quotations omitted).  Thus, Class Counsel's recommendation in this Action that the Settlement is fair, reasonable and adequate "strongly favor[s]" approval. *Lane*, 166 F. Supp. 3d at 1191.

### g.       The Presence of a Governmental Participant

On June 7, 2019, pursuant to the notice provisions of the federal Class Action Fairness Act of 2005 (CAFA), the Parties directed notice of the Settlement to the Attorney General of the United States and 59 other officials, including the Attorneys General of each of the 50 states, the District of Columbia, United States Territories, and state insurance commissioners for Alaska, Oregon, and Washington.  *See* 28 U.S.C. § 1715; First Azari Decl. ¶ 9.  The 90-day notice period expired on September 6, 2019, and neither Class Counsel nor the Settlement Administrator has

received any inquiries from any federal or state official in response to the CAFA notice.  First

Azari Decl. ¶ 9; Dubanevich Decl. ¶ 4.

<b>h.        The Reaction of the Class Members to the Settlement</b>

The number of class members who object to a proposed settlement "is a factor to be

considered when approving a settlement" and the "absence of significant numbers of objectors

weighs in favor of finding the settlement to be fair, reasonable and adequate."  *Lane*, 166 F.

Supp. 3d at 1191.

As of January 8, 2020, the Claims Administrator has mailed 8,671,074 initial copies of

the Summary Notice and re-mailed 1,278,782 of the 1,775,986 undeliverable notices for which

Epiq was able to identify updated address information.  Second Azari Decl. ¶¶ 5, 6.  In addition,

Epiq emailed 1,416,369 Email Notices to 1,383,858 Class Members for which Premera was able

to provide a facially valid email address.  First Azari Decl. ¶ 16.; Second Azari Decl. ¶ 5.  In

addition, the Publication Notice was published in the Wall Street Journal on August 29, 2019.

First Azari Decl. ¶ 18.  The reach of the Notice Plan has been comprehensive.

As of the date of this Motion, only one member of the Settlement Class has objected to

the Settlement[8] and only 560 exclusions have been filed (Stephens Decl. ¶ 49; Second Azari

Decl. ¶ 11)—to put that number into context, even if 8,671 exclusions had been filed, that

number would represent only one-tenth of one percent of the Settlement Class.  Where notice to

a class of approximately 37,000 yielded nine objections and 86 opt-outs, the low rate of

---

[8] Class Counsel attempted to contact the objector on two occasions to address his concerns and explain the Settlement benefits, but he has not returned the calls to date.  Stephens Decl. ¶ 49.  The substance of this objection will be discussed in Plaintiffs' reply in support of this Motion, to be filed on February 19, 2020.  Dubanevich Decl. ¶ 5.

objections and exclusions were "indicia of the approval of the class of the terms of the settlement support a finding of fairness under Rule 23." *Hughes v. Microsoft Corp.*, 2001 WL 34089697, at *8 (W.D. Wa. Mar. 26, 2001) (granting final approval where "less than 1% of the class opted out and only nine objections were submitted"); *see also Churchill Vill., L.L.C. v. Gen. Elec.,* 361 F.3d 566, 577 (9th Cir. 2004) (affirming final approval where 90,000 notified class members yielded 45 objections and 500 opt-outs). Here, the ***single*** objection and low percentage of opt-outs received as of the date of this filing (approximately .006%) weigh in favor of final approval. *See DIRECTV, Inc.*, 221 F.R.D. at 529 ("It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement . . . are favorable to [] class members.").

The Class response to the notice procedure has been more robust than in other data breach settlements, attesting to the effectiveness of the notice procedures approved by the Court. To date, claim forms have been received from 691,870 Class Members, representing a current claim return rate of 7.81%. Second Azari Decl. ¶ 12. This rate far exceeds the claims rate from other major data breach settlements: 0.2% (*See In re Target Corp. Customer Data Sec. Breach Litig.*, No. MDL 14-2522 (PAM), 2017 WL 2178306, at *2 (D. Minn. May 17, 2017), *aff'd*, 892 F.3d 968 (8th Cir. 2018)); and 2% (*In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 329 (N.D. Cal. 2018), *appeal dismissed sub nom. In re Anthem, Inc., Customer Data Sec. Breach Litig.*, No. 18-16866, 2018 WL 7890391 (9th Cir. Oct. 15, 2018*), and appeal dismissed sub nom. In re Anthem, Inc., Customer Data Sec. Breach Litig.*, No. 18-16826, 2018 WL 7858371 (9th

Cir. Oct. 17, 2018)).[9]  Such a significant claims rate, coupled with the low number of objections

and opt-outs, attests to the effectiveness of the notice process, the strength of the terms of the

Settlement, and is indicative of broad support for the Settlement from the Class.

> **3.**     **The Settlement is fair, reasonable, and adequate under the newly amended Rule 23(d)(2) factors.**

Rule 23(e)(2) recently was amended to require the Court to consider a list of factors and

approve a settlement "only after a hearing and only on finding that it is fair, reasonable, and

adequate after considering whether": "(A) the class representatives and class counsel have

adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief

provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and

appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including

the method of processing class-member claims; (iii) the terms of any proposed award of

attorneys' fees, including timing of payment; and (iv) any agreement required to be identified

under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other."

It is unclear whether the amended Rule 23(e)(2) factors should apply in this Action.

After promulgating the amendments, the Supreme Court transmitted them to Congress with the

instruction that the amendments "shall take effect on December 1, 2018, and shall govern in all

proceedings in civil cases thereafter commenced and, insofar as just and practicable, all

proceedings then pending."  *Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018 WL

6619983, at *4 n.5 (N.D. Cal. Dec. 18, 2018).  Because this Action commenced prior to

---

[9] At present, it is difficult to estimate how much monetary compensation each Class Member who submits a Claim Form will receive, due to the high rate of claims still being processed. Plaintiffs will include this estimate in its Reply in support of this Motion, to be filed on February 19, 2020.  Dubanevich Decl. ¶ 6.

December 1, 2018, the new Rule 23(e)(2) factors do not automatically govern this Settlement, but the Court may consider them if it decides it is "just and practicable" to do so.  Regardless, as described below, there is significant overlap between the new Rule 23(e)(2) factors and the *Hanlon* factors, and the Court should find that the Settlement is fair, reasonable, and adequate under either standard.[10]

### a.    The Plaintiffs and Class Counsel Have Adequately Represented the Class

Plaintiffs and Class Counsel have adequately represented the Class in connection with both the litigation and the Settlement.  Plaintiffs have claims that are typical of and coextensive with those of the Class, and they have no interests that are antagonistic to other members of the Class.  *See Hanlon*, 150 F.3d at 1020.  Indeed, Plaintiffs share the primary goal with the Class of obtaining the largest possible recovery from the Defendant.  *See In re Polaroid ERISA Litig*., 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members.").  The Plaintiffs played a very active role throughout the litigation, stepping forward to represent the proposed Class, searching for and producing relevant documents and responding to interrogatories, and preparing for and sitting for their depositions.  *See* Stephens

---

[10] The Advisory Committee acknowledged other factors—including those from *Hanlon*—employed by various circuits, and explained that the new Rule 23(e)(2) factors were not designed to displace any factor, but rather to "focus the court and the lawyers on 'the core concerns of procedure and substance that should guide the decision whether to approve the proposal.'" Accordingly, the small number of courts in this Circuit to date that have relied upon the Rule 23(e)(2) factors have done so while also considering the *Hanlon* factors.  *See In re Extreme Networks, Inc. Sec. Litig*., 2019 WL 3290770, at *6 (N.D. Cal. July 22, 2019) (quoting Advisory Committee Notes to 2018 Amendments, Fed. R. Civ. P. 23(e)(2)) (applying the framework set forth in Rule 23 with guidance from the Ninth Circuit's precedent); *Hefler*, 2018 WL 6619983, at *4.

Decl. ¶¶ 12–27.  They also retained counsel to assist them who are highly experienced in class action and data breach litigation.  *See* Declarations of Keith S. Dubanevich, James J. Pizzirusso, Karen Hanson Riebel, Kim D. Stephens, and Tina Wolfson in Support of Plaintiffs' Motion for Class Certification (Dkt. 157–59, 161, 163).

Class Counsel diligently represented the Class throughout the course of this protracted litigation.[11]  This case was complex and hard-fought.  Class Counsel, who are experienced in litigating consumer, privacy, and data breach class action cases, have spent almost five years litigating this case, conducting discovery, and advocating for the Class.  As a result of their efforts, the negotiated Settlement provides considerable monetary and equitable relief to each of the Settlement Class members.  By any measure, Class Counsel's efforts constitute adequate representation of the Class.

### b.    The Proposal Was Negotiated at Arm's Length

As discussed *supra* in Sections III.C and IV.B.1, the Parties reached a Settlement only after lengthy negotiations between experienced counsel at mediation sessions overseen by highly experienced mediators.  For the same reasons described *supra* in Section IV.B.1, this factor strongly supports approval of the Settlement.

### c.    The Relief Provided to the Class is Adequate

This factor encompasses the analysis of the same information as the *Hanlon* factors concerning: the strength of Plaintiffs' case (*see supra* Section IV.B.2.a); the risk, expense, complexity and likely duration of further litigation (*see supra* Section IV.B.2.b); the risk of

---

[11] Class Counsel's efforts are described in more detail in the contemporaneously submitted Plaintiffs' Motion for Attorneys' Fees.

maintaining class action status through the trial (*see supra* Section IV.B.2.c); and the amount offered in settlement (*see supra* Section IV.B.2.d).

In addition to these previously described *Hanlon* factors, this Rule 23(e)(2) factor also requires the Court to consider several other issues, the first of which is "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." Here, as set forth in the Class Notice and Claim Form (SA, Exs. B, C, and E), the process for submitting a claim is straightforward and the manner in which Settlement Funds will be allocated is simple and efficient. Proposed Settlement Class Members can either fill out and mail back a tear-off postcard with postage prepaid, fill out a claim online and submit it electronically with an electronic signature, download a form from the settlement website, or request a paper copy of a claim form from the Settlement Administrator. Any residual settlement funds will be distributed, to the extent feasible, first as additional cash compensation or credit monitoring and identity theft insurance to the Class, and to the extent not feasible for such distribution, to an appropriate *cy pres* recipient the Court approves. (SA, ¶ 4.7.1(c)).

The second additional issue under this factor is "the terms of any proposed award of attorneys' fees, including timing of payment." The fee award in this case will be set by the Court. The contemporaneously submitted Plaintiffs' Motion for Attorneys' Fees addresses the reasonableness of the requested award in detail.

Finally, the Court must consider "any agreement required to be identified under Rule 23(e)(3)." The Parties previously submitted to the Court, under seal, the specific terms of a tip over agreement. (Dkt. 278). This agreement is reasonable and does not affect the adequacy of the Settlement.

For the same reasons as described above regarding the *Hanlon* factors, the three additional elements of the new Rule 23(e)(2) support a finding that the Settlement is fair, reasonable, and adequate.

### d.     The Proposal Treats Class Members Equitably Relative to Each Other

The Settlement treats Class Members equitably in that "the apportionment of relief among Class Members takes appropriate account of differences among their claims." *See Zamora Jordan v. Nationstar Mortg., LLC*, 2019 WL 1966112, at *5 (E.D. Wash. May 2, 2019); *see also In re Extreme Networks*, 2019 WL 3290770, at *8 ("Consistent with [the] instruction [to consider whether the proposal treats class members equitably], the Court considers whether the proposal improperly grants preferential treatment to class representatives or segments of the class." (internal quotation omitted)).

Here, Class Members are treated equitably because the Settlement apportions relief commensurate with the strength of particular claims.  While all Class Members are entitled to collect the default settlement amount and up to two years of credit monitoring, Class Members can also collect up to $10,000 if they prove out-of-pocket damages plausibly traced to the Data Breach.  In addition, Class Members who were California residents at the time of the Data Breach can claim up to an additional $50 in recognition of their potential claims under the CMIA.  Thus, differences in the amounts available to particular Class Members are attributable primarily to the strength of their claims and the possibility of additional claims.  *See Zamora Jordan*, 2019 WL 1966112, at *5.  Because the Settlement treats Class Members equitably, this factor also supports a finding that the Settlement is fair, reasonable and adequate.

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court to enter their proposed order finally certifying the Settlement Class and granting final approval of the Settlement, and execute the proposed final judgment of dismissal with prejudice.

DATED: January 10, 2020                **TOUSLEY BRAIN STEPHENS PLLC**


/s/ Kim D. Stephens
**Kim D. Stephens**, OSB No. 030635
**Christopher I. Brain**, *admitted pro hac vice*
**Jason T. Dennett**, admitted *pro hac vice*
1700 Seventh Avenue, Suite 2200
Seattle, WA 98101
Tel: (206) 682-5600
Fax: (206) 682-2992
Email:  cbrain@tousley.com
        kstephens@tousley.com
        jdennett@tousley.com

**STOLL STOLL BERNE LOKTING
& SHLACHTER P.C.**


/s/ Yoona Park
**Keith S. Dubanevich**, OSB No. 975200
**Yoona Park**, OSB No. 077095
209 SW Oak Street, Suite 500
Portland, OR 97204
Tel: (503) 227-1600
Fax: (503) 227-6840
Email:  kdubanevich@stollberne.com
        ypark@stollberne.com

Tina Wolfson
AHDOOT AND WOLFSON, PC
10728 Lindbrook Drive
Los Angeles, CA 90024
Tel: (310) 474-9111
Fax: (310) 474-8585
Email: twolfson@ahdootwolfson.com

James Pizzirusso
HAUSFELD LLP
1700 K. Street NW, Suite 650
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
Email: jpizzirusso@hausfeldllp.com

Karen Hanson Riebel
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S., Suite 2200
Minneapolis, MN 55401
Telephone: 612-339-6900
Facsimile: 612-339-0981
Email: khriebel@locklaw.com

*Plaintiffs' Settlement Class Counsel*